UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X

UNITED STATES,

     -against-

KUO CHEN,

        *Defendant.*

----------------------------------X

<u>**MEMORANDUM & ORDER**</u>

10-cr-671(S-1) (KAM)

**MATSUMOTO, United States District Judge:**

Following a jury trial, defendant Kuo Chen ("Chen" or "defendant") was convicted on all counts of a two-count Superseding Indictment. Before the court is defendant's motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 ("Rule 29"). For the reasons set forth below, the motion for a judgment of acquittal is denied.

**BACKGROUND**

**I.    The Charges**

On December 30, 2010, the government filed a two-count Superseding Indictment,[1] charging Chen and co-defendant Shi Xing Dong ("Dong") with extortion conspiracy and attempted extortion in violation of 18 U.S.C. §§ 1951(a)[2] and 3551[3] <u>et seq.</u> (<u>See</u> ECF

---

[1]    The original indictment, filed on September 1, 2010, charged Chen and co-defendant Yan Hua Jiang ("Jiang") with extortion conspiracy and attempted extortion. (<u>See</u> ECF No. 9, Indictment.) Jiang pleaded guilty Count One of the Indictment, charging extortion conspiracy, on December 29, 2010. (<u>See</u> ECF No. 46, Minute Entry for Change of Plea Hearing as to Jiang dated 12/29/2010.)

[2]    18 U.S.C. § 1951(a) provides, in part, that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article

No. 47, Superseding Indictment ("Ind't").)  Specifically, the

Superseding Indictment charged that in or about and between

January 2010 and August 2010, Chen and Dong, together with

others, conspired and attempted to "obstruct, delay and affect

commerce, and the movement of articles and commodities in

commerce, by extortion," in that they agreed and attempted to

obtain the business of a competing bus company from De Mao Huang

("Huang"),[4] with his consent, "which consent was to be induced by

wrongful use of actual and threatened force, violence and fear."

(Ind't ¶¶ 1-2.)

Dong pleaded guilty to Count One of the Superseding

Indictment, charging extortion conspiracy, on January 19, 2011.

(See Minute Entry for Change of Plea Hearing as to Dong dated

1/19/2011.)  Chen proceeded to trial, and jury selection and

trial commenced on January 24, 2011.  (See Minute Entry dated

1/24/2011.)

---

or commodity in commerce, by . . . extortion or attempts or conspires so to
do" shall be guilty of a crime.  Subsection (b) defines "extortion" as "the
obtaining of property from another, with his consent, induced by wrongful use
of actual or threatened force, violence, or fear, or under color of official
right."

[3]    18 U.S.C. §§ 3551 et seq. generally provide penalties for offenses
described in any federal statute.

[4]    Huang is referred to in the Superseding Indictment as "John Doe #1."
(See Ind't.)

II.    **The Evidence at Trial**

At trial, the government called as witnesses the following individuals:

**A. De Mao Huang**

First, the government called Huang, the owner of the Shun An Travel Company. (Tr.[5] 177.) Huang operated the Shun An Travel Company for several years, transporting restaurant workers between Brooklyn or Chinatown and Poughkeepsie. (Id. 177-78.) In December of 2009 or January of 2010, Huang learned that a competing van service, the Lan Qi Bus Company, was driving the same Brooklyn to Chinatown to Poughkeepsie route. (Id. 187-88.) Huang observed two vehicles associated with the Lan Qi Bus Company, a white BMW and a Dodge van with license plate ending in 5901. (Id. 189; see also GX[6] 5A-D (pictures of Dodge van with license plate ending 5901).)

Shortly after learning of the competing bus company, Huang saw the white BMW associated with the Lan Qi Bus Company at the Walmart in Poughkeepsie, one of two passenger pickup locations in the area used by the Shun An Travel Company. (Tr. 180, 191.) While Huang parked his vehicle to let passengers board, the driver of the white BMW drove up to Huang, stuck out

---

[5]    "Tr." refers to the trial transcript (pages 1-721), recording the jury selection and trial of January 24-31, 2011.

[6]    "GX" refers to the government's exhibits admitted into evidence at trial.

his middle finger, and parked the white BMW to prevent Huang from moving his van. (Id. 191.) Huang identified the driver of the white BMW as Jiang. (Id. 192; GX 41A (picture of Jiang).)

In January of 2010, Huang had another encounter with the Lan Qi Bus Company. (Tr. 193.) While the Shun An Travel Company van was parked in front of QQ Bakery, the Shun An Travel Company pickup location in Chinatown, the white BMW and the Dodge van belonging to the Lan Qi Bus Company drove up to Huang and boxed in his vehicle. (Id. 178, 193.) According to Huang, Jiang walked up to him, opened the vehicle door, and threatened that if he saw the Shun An Travel Company driver again, Jiang would "break [Huang's] leg." (Id. 193-94.) Huang's son recorded the incident on his phone, and the video of the encounter was introduced into evidence and played at trial. (Id. 195-97, 203-04; GX 8 (video of QQ Bakery encounter), 8A (translation of video of QQ Bakery encounter).) After this incident, Huang became "very scared." (Tr. 205.)

In or about February of 2010, while Huang was picking up a passenger from the Walmart in Poughkeepsie, a person driving the Dodge van belonging to the Lan Qi Bus Company drove up to Huang. (Id. 205.) The driver parked next to Huang, rolled down his window, and pointed his finger at Huang, saying that Huang could not pick up passengers from that location anymore. (Id. 205-06.) On a separate occasion, also in or

about February of 2010, Huang observed Jiang and other
individuals gesturing aggressively at passengers at the Sunoco
in Poughkeepsie, another pickup location. (Id. 206-07.) Huang
testified on cross-examination that he did not believe that Chen
was involved in any of the incidents described above. (Id. 247-
48.)

Huang believed the Lan Qi Bus Company stopped
operating in April and May of 2010. (Id. 207.) On June 17 or
18, 2010, Huang learned from some of his customers that the Lan
Qi Bus Company was again driving the Brooklyn to Chinatown to
Poughkeepsie route. (Id. 208.) Huang obtained a copy of the
business card for the Lan Qi Bus Company, which was an exact
replica of the business card for Shun An Travel Company, with
the exception of the company name, the contact phone numbers,
and the text color. (Id. 208-09; GX 10 (Shun An Travel Company
business card), 10A (translation of Shun An Travel Company
business card), 11 (Lan Qi Bus Company business card), 11A
(translation of Lan Qi Bus Company business card).)

After working on June 20, 2010, Huang returned to
Brooklyn at around 1:00 AM on June 21, 2010, and parked his van
at a lot on 48th Street, between 8th and 9th Avenues. (Id. 212-
13, 216-17; GX 12A-D (pictures of 48th Street parking lot).)
Huang testified that there is a street lamp outside the parking
lot, and that the area is well-lit at night. (Tr. 214; GX 52A

(picture of 48th Street parking lot area at night).)  While Huang was locking the parking lot gate, he was attacked by three people with wooden or metal sticks, and fell to the ground. (Tr. 218.)  Huang grabbed a broken-off piece of a wooden stick, stood up, and swung the stick at one of his attackers.  (Id. 218-19, 254-55.)  At this point, Huang was bleeding and very scared.  (Id. 255-56.)  Huang testified that, when he swung the stick to hit his attackers, he was able to see the face of one of his attackers and identified Chen as that person.  (Id. 219.)

When neighbors threatened to call the police, the attackers began to run away in the direction of 9th Avenue. (Id. 220, 258.)  Huang ran after his attackers, at which point Chen said to him "Come over. Let's do it."  (Id. 220.)  One of the attackers then ran toward 49th Street, and the other two ran toward 47th Street.  (Id. 258.)  Because his attackers were too far, however, Huang returned to 48th Street, where police cars were waiting.  (Id. 220-21.)  Huang was taken by ambulance to the hospital, where he was treated for the injuries he sustained during the attack, including a laceration to the head and bruising on his torso and legs.  (Id. 221-23; GX 14A-N (pictures of Huang's injuries sustained after the attack), 16 (hospital records), 18 (Huang's shirt after the attack).)

After the June 21, 2010 attack, Huang rested for a few weeks and then returned to work.  (Tr. 227.)  On the early

morning on July 19, 2010, while Huang accompanied a new driver to the parking location, Huang received a phone call. (Id. 227-28.) The caller threatened Huang, saying that he would "come to [his] house and . . . kill [his] whole family" if Huang continued working. (Id. 228.)

After the June 21, 2010 attack, Huang testified that he saw the defendant again in July of 2010 in Poughkeepsie. (Id. 228, 261.) Huang called 911, and showed the police the report of the previous attack. (Id.) Huang testified that he saw Chen again in either July or August of 2010 on the FDR Drive, driving the Lan Qi Bus Company white Dodge van. (Id. 229-30.) According to Huang, Chen cut in front of him with the Dodge van and began accelerating and breaking, preventing Huang from merging onto another lane. (Id. 231.) Huang's son, who was in the car at this time, recorded the incident on his phone. (Id. 231-32; GX 6.) Upon arriving in Brooklyn, Huang called 911 and told the police that Chen, the man who had attacked him on June 21, 2010, was driving the Dodge van. (Tr. 232.)

On cross-examination, Huang testified that shortly before his attack on June 21, 2010, he saw three men exiting a silver Lexus SUV, two wearing white shirts and one wearing a blue or black shirt. (Id. 250-51.) Huang initially told the FBI that these were the three men who attacked him, although he could not be sure. (Id. 251-52.) Huang also testified that he

7

identified another man, Zhen Pan, as one of his attackers based only on his body build. (Id. 226-27, 264.) In addition, during a grand jury hearing held on November 22, 2010, Huang testified that he saw the faces of two, not one, of his attackers. (Id. 266.) At trial, however, Huang maintained that he only saw one face during the June 21, 2010 attack, and that it was Chen. (Id. 268-69.)

### B. Chi Kong Fung

Next, the government called Chi Kong Fung ("Fung") to testify. (Id. 274.) Fung worked for Huang[7] as a driver from August or September of 2009 until August or September of 2010. (Id. 277.) When Fung first started driving for Huang, there was no competition, but a competing bus company started operating in around January of 2010. (Id. 281.) The competing bus company operated two vehicles, a white van with license plate ending in 5901[8] and a white BMW. (Id. 281-82.)

In or around January of 2010, while Fung was waiting for passengers in front of the QQ Bakery, the white van and the white BMW double-parked near the Shun An Travel Company vehicle. (Id. 282-83.) Fung became very scared and agreed with Huang to

---

[7]    Fung refers to Huang as "Ah Huang." (Tr. 277.)

[8]    Fung initially indicated that the license plate number for the white van was 5906. (Id. 281.) Moments later, however, Fung identified the white Dodge van with license plate ending in 5901 as the competing bus company vehicle, and indicated that he may have misspoken earlier when he gave the license plate number. (Id. 284.)

go get the police.  (Id. 284-85.)  Because the competitors had double-parked, Fung was unable to exit through the driver's side and instead exited through the side door to search for the police.  (Id. 285.)

On a separate occasion, at the Sunoco in Poughkeepsie, the driver of the BMW walked up to Fung, knocked on his window, asked "You're not afraid of dying?" and blew cigarette smoke on his face.  (Id. 286-88.)  The driver then gave Fung the middle finger, began gesturing for Fung to get out of his vehicle, and again blew cigarette smoke on his face.  (Id. 288.)  Fung threatened to call the police, and the man went back to his car.  (Id. 289.)  When Fung turned on the van to exit the Sunoco, the driver of the BMW blocked the exit.  (Id.)  Fung was able to leave by following another vehicle out of the gas station.  (Id. 290.)  The white BMW and white van followed Fung out of the Sunoco, and the white BMW attempted to prevent Fung from getting on the highway by stopping the BMW vehicle in a manner to block the on-ramp.  (Id. 290-91.)  Fung was able to drive around the white BMW and get on the highway.  (Id. 291.)  The white BMW followed, cut in front of Fung, and slowed down to a crawl, preventing Fung from driving on.  (Id. 291-92.)  Fung was finally able to speed up and exit the highway, losing the white BMW.  (Id. 292.)

Initially, when shown a picture of Jiang, Fung was unable to identify him.  (Id. 286.)  However, after refreshing his recollection with a previous identification, Fung was able to recognize Jiang as the driver of the white BMW from the competing bus company.  (Id. 293-94.)

Finally, Fung testified that on one occasion, Huang instructed him to change the usual Walmart pickup location for the employees of the Hudson Buffet in Poughkeepsie.  (Id. 294-97.)  Fung observed a vehicle from the competing bus company parked in front of the Hudson Buffet, and the employees had to exit through the back door to get to the Shun An Travel Company van.  (Id.)

### C. Xin Ming Wang

The government then called Xin Ming Wang[9] ("Wang") to testify.  (Id. 298.)  Wang, a restaurant worker at the Hudson Buffet in Poughkeepsie, used Huang's van service to travel to New York City.  (Id. 299-300.)  In or about February of 2010, Wang learned of a competing bus service, Lan Qi Bus Company, when the driver passed out business cards.  (Id. 300-01.)  Wang identified the white van with license plate 5901 as belonging to the Lan Qi Bus Company.  (Id. 301.)

---

[9]    The record is unclear as to the correct spelling of this witness's last name.  The trial transcript uses both "Wang" and "Huang."  (Tr. 298, 300.) For clarity purposes, the court will refer to this witness as "Wang."

At around that same time, February of 2010, Wang had an encounter with the Lan Qi Bus Company. (Id. 301.) Wang walked across from the Hudson Buffet to the Walmart, the usual pickup location for the Shun An Travel Company, and the Lan Qi Bus Company van was parked there, along with a black Acura. (Id. 301-02.) When Wang refused to get in the Lan Qi Bus Company vehicles, Jiang took his phone and beat him, saying he had to get in and that Wang could not ride with Huang. (Id. 302-04; GX 41A (picture of Jiang).) On a separate occasion, also in February of 2010, Wang was forced into a Lan Qi Bus Company vehicle. (Tr. 303.)

In the summer of 2010, Wang again saw the Lan Qi Bus Company white van. (Id. 304.) Wang was riding with Huang in the Shun An Travel Company van, driving from Poughkeepsie to Chinatown, when the white van cut in front of them and started "breaking, also playing tricks on them." (Id. 304-06.) Huang's son, who was also in the van with Huang and Wang, took video of the incident. (Id. 305-06.) Wang only saw the driver of the Lan Qi Bus Company in passing, and he testified on cross-examination that he was unable to make an identification. (Id. 306.)

### D. Dong Ong Guan

Next, the government called Dong Ong Guan ("Guan"), also known as "Danny," to testify. (Id. 310.) At about 12:30

or 12:40 AM on June 21, 2010, Guan was returning from an amusement park with friends, and parked on 48th Street, near 8th Avenue, in Brooklyn. (Id. 311-13.) Guan returned to the car to retrieve his keys. (Id. 313.) Guan heard a wooden noise, and when he turned his attention in the direction of the noise, Guan heard a man screaming. (Id. 313-14.) Guan saw two or three individuals beating the male victim, and then saw one or two other individuals, advancing on 48th Street from the direction of 8th Avenue, join the beating. (Id. 315-16, 325-26, 329.) Guan was standing approximately 50 feet away, and the lighting conditions were poor. (Id. 314, 316.) Additionally, Guan's vision was impaired that night, though he could still see the outlines of the attackers. (Id. 316-17.)

Guan yelled out to the attackers that he would call 911, and walked towards 8th Avenue and called the police. (Id. 318; GX 19B (recording of 911 call by Guan on June 21, 2010), T19B (transcription of 911 call by Guan on June 21, 2010).) According to Guan, the incident lasted approximately 3-4 minutes. (Tr. 325.) Guan last saw the victim running towards 9th Avenue, but could not be sure if the victim was chasing the attackers or whether the attackers were chasing the victim. (Id. 327-29.)

**E. Whan Zhu Jiang**

The government called Wan Zhu Jiang ("Wan Zhu") to the stand, who was subpoenaed by the government to testify at the trial.  (Id. 332.)  Wan Zhu met Chen in China, and had been his girlfriend for over two years.  (Id. 333-34.)  Wan Zhu testified that on June of 2010, Chen began working for a bus company, driving a white van between Poughkeepsie and New York City. (Id. 335, 337.)  Jiang, whom Wan Zhu met once, owned the white van, as well as a BMW.  (Id. 335-36.)  Chen started driving Jiang's white van in June of 2010.  (Id. 337.)

Wan Zhu testified that her phone number is 845-548-7150, and that she regularly called Chen on a phone number 646-359-2835, which is the same phone number that appears on the Lan Qi Bus Company business card.  (Id. 338-39.)  Wan Zhu would also call Chen on phone number 845-775-0019, which Chen got from a friend, though she used this number less frequently.  (Id. 339.) Chen used this last phone number from June to July of 2010, and Wan Zhu believed the 845-775-0019 phone to be a prepaid phone. (Id. 339-40.)  Only Chen called Wan Zhu using the 845-775-0019 number, and only Chen answered when Wan Zhu called the 845-775-0019 number.  (Id. 340.)

After the defendant was arrested, he made a call to Wan Zhu from the Metropolitan Detention Center (the "MDC call"). (GX 38 (recording of MDC call); GX 38A (translation of MDC

call); 55 (stipulation regarding recording of phone call from
Chen to Wan Zhu).) During the call, the following was said:

> Chen: ". . . This phone number was not my . . . was
> not .. . the phone at that time was 845-775-0019.
> That phone. That phone. That was not my phone.
> Didn't know my number. So this was not my phone. All
> right? . . . [T]his phone number is canceled already.
> This phone number was not subscribed by someone. It
> was by using the phone card that was bought. The
> phone was canceled. . ."

> Wan Zhu: "This phone's name and address were all
> fake."

> Chen: "Right. All fake. Right."

(GX 38A.)

### F. Jeffrey Strohm

Next, the government called Jeffrey Strohm ("Strohm"),
a Sprint Nextel Communications records custodian. (Tr. 352.)
Strohm testified that the 845-775-0019 phone number was assigned
to a prepaid phone, and that the account was opened on June 20,
2010 with unverified information and subscribed to an "SS ZZ."
(Id. 354; GX 23 (subscriber information and call detail records
for 845-775-0019).) Further, Strohm testified that the records
for 845-775-0019 reflect 18 calls made to and from the phone
between 12:14 AM on June 20, 2010 and 1:02 AM on June 21, 2010;
no activity between 1:02 AM and 1:14 AM on June 21, 2010; and a

call to phone number 845-548-7150 at 1:17 AM on June 21, 2010. (Tr. 355-56.)[10]

Strohm also testified about the cell site information for phone number 845-775-0019 on June 21, 2010. (GX 23A (cell site information for 845-775-0019).) Strohm explained that the cell site information reflects the cell towers to which a phone connects, and that proximity to the tower is the primary factor determining that connection. (Tr. 356-58.) Other factors, such as radio-frequency and signal strength, will also affect cell site information. (Id. 358, 362-63.) Strohm testified that the cell cite information for 845-775-0019 reflects that between 12:14 AM and 12:19 AM on June 20, 2010, the phone connected to various cell towers in Brooklyn. (Id. 360.) Starting at 12:19 AM until 1:02 AM on June 21, 2010, 845-775-0019 connected to a cell tower located between 46th and 47th Streets off of 9th Avenue in Brooklyn, the closest cell tower to 48th Street between 8th and 9th Avenues. (Id. 360-61.) Finally, at about 1:14 AM, 845-775-0019 connected to a cell tower at 55th Street and 10th Avenue in Brooklyn. (Id. 361.)

### G. Shi Xing Dong

The government called co-defendant Dong, who testified pursuant to a Cooperation Agreement he entered into with the

---

[10]    The phone records were discussed in more detail during the testimony of Special Agent Philip Wu.

government.  (Id. 367, 370-72; GX 50 (Cooperation Agreement).)

Dong pleaded guilty to Count One of the Superseding Indictment,

charging extortion conspiracy, and faces a statutory range of

imprisonment of 0-20 years.  (Tr. 371-72, 469-70; GX 50.)  The

government estimated the Sentencing Guidelines range for Dong to

be 57-71 months imprisonment.  (Tr. 472.)  The Cooperation

Agreement states that "[i]f the [government] determines that

[Dong] has cooperated fully, provided substantial assistance to

law enforcement authorities and otherwise complied with the

terms of [the] agreement, the [government] will file a motion

pursuant to U.S.S.G. § 5K1.1 with the sentencing Court setting

forth the nature and extent of his cooperation," which "will

allow the Court, in applying the advisory [Sentencing]

Guidelines, to consider a range below the Guidelines range that

would otherwise apply."  (GX 50 ¶ 6; see also Tr. 372-73.)

        Dong admitted that, on June of 2010, he participated

in a beating, along Chen and two others, at 48th Street and 8th

Avenue in Brooklyn.  (Tr. 367.)  Dong had known Chen, whom he

also knows by the nickname Lin Feng, for approximately 3 years.

(Id. 368, 376.)  Dong and Chen are good friends, and Chen

attended Dong's wedding.  (Id. 376-78; GX 45A-G (photos of

Dong's wedding).)

        In May of 2010, Chen approached Dong about starting a

bus business driving restaurant workers between Brooklyn or

Chinatown and upstate New York.  (Tr. 381, 475.)  Chen explained that Jiang, whom Dong also knew as Hua Jie, had attempted the same route in the past but was not able to compete with another company, and therefore they needed to beat up the competitor.  (Id. 381-85, 493.)  The idea to beat up the competitor came from Jiang.  (Id. 385.)  Chen and Dong discussed that Jiang would provide them with a white van and that, if they were able to drive this route, Jiang, Chen and Dong would share the profits.  (Id. 385-86.)

Dong told the defendant that they would discuss the matter again after Dong got married.  (Id. 386, 475-76.)  One week after the wedding, Dong and Chen met again to discuss the plan to find the competitor and beat him up.  (Id. 386-87, 476.)  Dong also spoke with Jiang on the phone and discussed the plan.  (Id. 387-88, 476.)  Jiang gave Chen information to find the competitor, including the license plate of his van and the fact that he returned to Brooklyn at around 12:50 to 1:00 AM.  (Id. 388-98.)

A few days later, Dong met Jiang in upstate New York.  (Id. 389, 477-78.)  Chen was there learning how to drive the bus route, and took Dong to meet Jiang before leaving to meet his girlfriend.  (Id.)  During this meeting, Jiang and Dong discussed the plan to beat up the competitor, the potential profits from the bus route, and Jiang assured Dong that if

anyone got arrested for beating the competitor, the bus business would pay $2,000 a month and pay for attorneys. (Id. 389-91.)

Dong testified that Chen used the information provided by Jiang to find the competitor. (Id. 391, 479-80.) Specifically, Chen followed the competitor around and, after two attempts, found the place in Brooklyn where he parked his vehicle, on 48th Street and 8th Avenue. (Id. 392-93.) The next night, Chen called Dong at about 12:00 AM, and they agreed to meet at 48th Street and 8th Avenue. (Id. 392-94.) They waited for the competitor and confirmed the location of his parking lot. (Id. 394-95.)

For about one week after this, Dong and Chen returned to the location approximately six times to attempt the beating, but were unsuccessful. (Id. 396-97.) Dong saw the competitor approximately three times during these unsuccessful attempts. On two occasions, the competitor was walking with other people. (Id.) On another occasion, the competitor was alone but Dong backed out of the attack. (Id. 396-97, 400-01.) Dong testified that, after he failed to beat the competitor, Chen said to him "Motherfucker, why didn't you go over and hit him?" (Id. 401.)

Chen was present during each attempt, and each time Dong knew when and where to go because Chen would call him with the information. (Id. 398.) They had no weapons during the first few attempts, but Chen provided wooden sticks during the

last few attempts.  (Id. 398-99.)  After each unsuccessful attempt, Chen called Jiang, who asked why they had not yet completed the beating.  (Id. 405.)

On a subsequent night, Chen called Dong to come to his apartment in Brooklyn and asked that Dong bring a metal stick, a police baton, with him.  (Id. 402.)  Dong and Chen met with Ah Bui, also called Fatty, and Xing Xing, whom Dong knows only by nicknames.  (Id. 367-68, 403.)  Chen called both Ah Bui and Xing Xing to participate in the beating because Dong had backed out a few nights before.  (Id. 403-05.)  Dong was armed with the metal stick, and Chen, Ah Bui, and Xing Xing all had wooden sticks. (Id. 422.)  Chen provided Ah Bui with his wooden stick.  (Id. 423.)  Chen then suggested splitting up, Dong and Ah Bui walking to 8th Avenue and Chen and Xing Xing walking to 9th Avenue, in order to surround the competitor.  (Id. 424.)  Dong and Ah Bui saw the competitor with two other people, and therefore decided to abort the plan.  (Id. 425-26.)  They walked towards Chen and Xing Xing and told them that the competitor had left.  (Id. 426.)

The next night, Chen called Dong and told him to come out.  (Id. 427-28.)  As they did the night before, Chen and Dong picked up Ah Bui and Xing Xing on their way to 48th Street. (Id. 429.)  Dong was armed with the metal stick, and Chen, Ah Bui and Xing Xing had the wooden sticks.  (Id. 429.)  They split

up again, Dong and Ah Bui going to 8th Avenue and Chen and Xing Xing going to 9th Avenue.  (Id.)

When Dong and Ah Bui arrived at 48th Street, Dong saw Chen and Xing Xing already beating the competitor.  (Id. 431.) Chen had instructed Dong to beat the competitor on the legs so that he would not be able to drive.  (Id.)  The competitor was on the ground, stood up, and fell to the ground again.  (Id. 432.)  Dong ran over to the beating, and saw that the competitor was "bloody all over."  (Id.)  The competitor then grabbed a piece of a wooden stick that had broken off from one of the attacker's sticks and swung it at the attackers.  (Id.)  Dong hit the competitor twice with the metal stick on the leg, though not very forcefully.  (Id. 433-34.)  Xing Xing then grabbed the metal stick from Dong and began hitting the competitor again. (Id. 434.)  Chen was kicking and punching the competitor, but Dong did not see Chen using a stick during the beating.  (Id. 435.)  According to Dong, Ah Bui was standing on the street, to the side, away from the beating.  (Id. 436, 494.)

Dong testified that civilians started to gather around the beating, threatening to call the police.  (Id. 435.)  Chen then started running in the direction of 9th Avenue, and turned to 49th Street.  (Id. 435-36, 483, 485.)  Dong and Xing Xing ran in the direction of 9th Avenue and 47th Street.  (Id. 436, 483, 485.)

After the beating, Dong hid in the basement of a house on 47th Street, and later met Chen at his apartment on 7th Avenue and 57th Street.  (Id. 437-39.)  Chen scorned Dong for hitting the competitor too lightly, and told him that Jiang would "curse [him] out" if he found out.  (Id. 440.)  Dong did not see Ah Bui again until approximately one week later, when Ah Bui told him that after the beating, the competitor got up and started chasing after Dong.  (Id. 436, 440-41.)  Dong saw Xing Xing after the attack, and warned him "to be careful" after Chen was arrested.  (Id. 441-42.)

After the beating, Chen and Dong went upstate to see Jiang and met at his restaurant.  (Id. 445.)  Jiang told them that he would drive the white van to New York now that the beating was done and they could start the bus route.  (Id.) Dong spoke with Jiang again after Chen was arrested, and asked Jiang to hire an attorney and bail him out.  (Id. 444.)

Prior to the beating, Chen and Dong printed the business cards for Lan Qi Bus Company.  (Id. 447.)  Dong explained that the phone numbers on the card belonged to him and Chen, and that Chen got the design for the card from the competitor and copied it.  (Id. 446-48, 479.)  Dong and Chen began the bus business after the beating; Dong rode along with Chen to learn the route.  (Id. 446, 449-50.)  After about a week, however, Dong decided to quit the business.  (Id. 450.)

Dong did not receive any profits from the bus business because the competitor continued to operate his bus company and the Lan Qi Bus Company was not making any money.  (Id. 451.)  At this time, Jiang, Chen and Dong discussed beating up the competitor again.  (Id. 452.)  Both Chen and Dong agreed to do a second beating, although Dong testified that he did not intend to actually follow through.  (Id. 452-53.)

In addition to the 646-359-2835 phone number, Dong testified that the defendant also had a prepaid "walkie-talkie" phone.  (Id. 456.)  Chen mentioned to Dong that the walkie-talkie phones would be used so that the police could not trace the calls.  (Id. 457.)  Chen and Dong opened the walkie-talkie phone accounts by purchasing SIM cards for prepaid phones.  (Id. 457-58.)  Dong saved Chen's walkie-talkie number on his walkie-talkie phone under the number "0" because, according to Dong, the word Lin, part of Chen's Lin Feng nickname, means zero in Chinese.  (Id. 461.)

After Dong was arrested, he had a conversation with Chen in the courthouse holding cells while awaiting a court appearance.  (Id. 461, 463.)  Dong testified that Chen said to him not to plead guilty and "not to admit to the existence of the phone number with the 8."  (Id. 463-64.)  Chen then checked Dong to make sure he was not wearing a wire.  (Id. 464.)

Dong admitted to using drugs in the past, including ecstasy, marijuana, and ketamine. (Id. 379-80, 473-75.) However, Dong was not under the influence of any drug at the time of the beating of the competitor. (Id. 491.)

### H. Special Agent Philip Wu

As its last witness, the government called Special Agent Philip Wu ("Wu") to testify. (Id. 500.) Wu testified about the items recovered from the defendant after his arrest. (Id. 502.) One of those items was a vehicle registration card for a white Dodge van with license plate ETJ 5901 registered to Jiang. (Id. 504-05; GX 40B (registration card); GX 22B (registration card obtained from Department of Motor Vehicles).) The authorities also recovered from Chen a gray Samsung cellular phone with phone number 646-359-2835. (Tr. 511; GX 50 (gray Samsung phone).) Upon searching the Samsung phone, the authorities found the phone numbers for Jiang, Dong and Wan Zhu saved as contacts. (Tr. 515-16.)

Wu also testified about the items recovered from Jiang at the time of his arrest in August of 2010. (Tr. 508.) One of those items was a vehicle registration card for a white BMW registered to Jiang. (Id. 508.) The authorities also recovered from Jiang two cellular phones, one black BlackBerry and one gray Motorola. (Id. 512; GX 36-37 (phones recovered from Jiang).) The phone number for the BlackBerry phone was 917-535-

3355. (Tr. 512.) The phone number for the Motorola phone was
845-707-0796. (Id. 513.)

Further, Wu testified about the items recovered from
Dong after his arrest. (Id. 513-14.) First, an iPhone was
recovered from Dong, with phone number 646-421-3387. (Id. 514;
GX 32 (iPhone).) An additional phone was recovered from Dong,
with phone number 347-677-6751. (Tr. 514; GX 33 (walkie-talkie
phone).) Upon searching the iPhone, the authorities found two
phone numbers associated with Chen: (1) 646-359-2835; and
(2) 845-775-0019. (Tr. 516-17.) These numbers were saved under
Chen's nickname, Lin Feng. (Id. 517.) Dong also had saved in
his iPhone the number for Wan Zhu under "Lin Feng's Girl."
(Id.) The 845-775-0019 phone number was also saved in Dong's
second phone under the number "0." (Id. 519.)

Wu testified that the records for phone number 845-
775-0019 revealed that between June and July of 2010, there were
113 calls made between 845-775-0019 and the phone number
belonging to Wan Zhu. (Id. 518-19; GX 23, 23A (telephone
records for 845-775-0019).)

The government introduced into evidence a chart, and
Wu explained to the jury that the chart summarized the phone
records for the phone numbers belonging to Jiang, Chen, Dong,
and Wan Zhu for June 19-21, 2010. (Tr. 521-32; GX 30 (chart).)
The chart reflected, among other things, that in the minutes

leading up to the attack on Huang on June 21, 2010, there were a number of calls between the number belonging to Dong and the 845-775-0019 number.  (Tr. 523-25.)  Right after the attack, and then again the following afternoon, the 845-775-0019 called the phone number for Wan Zhu.  (Id. 525.)  Further, at 1:32 AM, after the attack on Huang, the 845-775-0019 again contacted the phone number for Dong.  (Id. 525.)

Wu testified that he reviewed the phone records for the phone belonging to Huang, and found that the threat made to Huang on July 19, 2010 was made from phone number 845-775-0019. (Id. 528.)  The government introduced into evidence a second chart, and Wu explained to the jury that this second chart summarized the calls made on July 18-19, 2010.  (Id. 527; GX 31 (chart).)  The chart reflects calls between the 845-775-0019 phone number and the phone numbers for Dong and Jiang both before and after the threat was made.  (Tr. 528-30.)  Moreover, the chart reflected four calls between the 845-775-0019 phone number and Wan Zhu the night the threat was made.  (Id. 530.)

### I. The Remainder of the Government's Case

In addition to witness testimony, the government introduced a number of stipulations and exhibits, some of which were referenced above.  One such stipulation, introduced into evidence as government exhibit 34, stated that "the business operated by De Mao Huang, Shun An Transportation Company,

affects interstate commerce and the movement of articles and commodities in commerce in that it transports restaurant employees to Chinese restaurants that receive food products purchased from out-of-state sources."  (Id. 351; GX 34.)

### J. The Defense Case

The defense did not call any witnesses or present any exhibits.  (Id. 534-35, 592.)

### III.  Motions for Judgment of Acquittal

At the close of the government's case, Chen moved pursuant to Rule 29(a) for a judgment of acquittal, arguing that "the evidence in this case is insufficient to sustain a conviction on either count."  (Id. 590.)  The court reserved ruling on the motion.  (Id. 591.)

After the jury returned a verdict of guilty on both counts (id. 715), the defense again moved for a judgment of acquittal.  (Id. 719.)  The court invited post-trial submissions, but the parties declined.  (Id.)

### DISCUSSION

### I.  Rule 29 Motion

Rule 29(a) provides that a district court shall enter a judgment of acquittal for "any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  A district court entertaining a motion for a judgment of acquittal, however, must be "careful to avoid usurping the role

of the jury." _United States v. Jackson_, 335 F.3d 170, 180 (2d
Cir. 2003). Thus, "Rule 29(c) does not provide the trial court
with an opportunity to substitute its own determination of . . .
the weight of the evidence and the reasonable inferences to be
drawn for that of the jury." _United States v. Guadagna_, 183
F.3d 122, 129 (2d Cir. 1999). Rather, in assessing a Rule 29
motion, a court must defer to the jury's resolution of
witnesses' credibility and its selection between competing
inferences that could be drawn from the evidence. _See_ _United
States v. Tocco_, 135 F.3d 116, 123 (2d Cir. 1998). This
requires the court to consider the evidence in the light most
favorable to the government and to draw all permissible
inferences that the jury may have drawn in the government's
favor. _Jackson_, 335 F.3d at 180.

Consistent with this deference, a jury verdict must be
upheld if "_any_ rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt." _See
id._ (quoting _Jackson v. Virginia_, 443 U.S. 307, 319 (1979)
(emphasis in original)). Moreover, the jury's verdict will be
upheld even when it is based entirely on inferences from
circumstantial evidence. _United States v. Mariani_, 725 F.2d
862, 865-66 (2d Cir. 1984); _see also_ _United States v. Lorenzo_,
534 F.3d 153, 159 (2d Cir. 2008) ("Direct evidence is not
required; '[i]n fact, the government is entitled to prove its

case solely through circumstantial evidence, provided, of
course, that the government still demonstrates each element of
the charged offense beyond a reasonable doubt.'") (quoting
United States v. Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)).
Finally, a court reviewing the sufficiency of the evidence must
be careful not to analyze particular pieces of evidence in
isolation, but instead should consider the evidence in its
totality.  See United States v. Rosenthal, 9 F.3d 1016, 1024 (2d
Cir. 1993).

       Only where the evidence that the defendant committed
the crime alleged is either "nonexistent or so meager that no
reasonable jury could find guilt beyond a reasonable doubt" may
a district court grant a Rule 29 motion.  Guadagna, 183 F.3d at
130 (internal quotations omitted).  Consequently, "[a] defendant
bears a heavy burden in seeking to overturn a conviction on
grounds that the evidence was insufficient" under Rule 29.
United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002)
(quoting United States v. Samaria, 239 F.3d 228, 233 (2d Cir.
2001)).  However, "[i]f the evidence viewed in the light most
favorable to the prosecution gives equal or nearly equal
circumstantial support to a theory of guilt and a theory of
innocence, then a reasonable jury must necessarily entertain a
reasonable doubt."  United States v. Glenn, 312 F.3d 58, 70 (2d
Cir. 2002) (internal quotation marks and citation omitted).

**II.     Application**

Chen argues that the evidence presented at trial was insufficient to support his convictions on Counts One and Two, i.e., extortion conspiracy and attempted extortion.

The Hobbs Act, under which the defendant was charged, provides, in pertinent part:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by . . . extortion or attempts or conspires to do so, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.
>
> (b) As used in this section . . .
>
> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
>
> (3) The term "commerce" means . . . all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951.

Thus, the government bore the burden of proving at trial, beyond a reasonable doubt, that: (1) the defendant conspired and attempted to obtain the property of another; (2) with his consent, induced by the wrongful use or threat of

force, violence, or fear; and (3) that the defendant's acts, had they been completed, would have affected interstate commerce. See Sand, Modern Federal Jury Instructions – Criminal, § 50.02; see generally Stirone v. United States, 361 U.S. 212 (1960).

For the first element, the government satisfies its burden of proving the conspiracy and attempt to "obtain property," either tangible or intangible, if it proves beyond a reasonable doubt that the defendant conspired or attempted "the deprivation of a property right from another, with [] the intent to exercise, sell, transfer, or take some other analogous action with respect to that right." United States v. Gotti, 459 F.3d 296, 324 (2d Cir. 2006). Second, the government must show beyond a reasonable doubt that the defendant conspired and attempted to obtain the property by coercing consent through the wrongful use of actual or threatened force, violence, or fear. See 18 U.S.C. § 1951(b)(2). Third, the government must show that, had the defendant completed the extortion, his actions would have had an effect on interstate commerce. See United States v. Parkes, 497 F.3d 220, 226 (2d Cir. 2007). A de minimis showing of an effect on interstate commerce is sufficient. Id. at 230; United States v. Perrotta, 313 F.3d 33, 36 (2d Cir. 2002) ("[I]f the defendant's conduct produces any interference with or effect upon interstate commerce, whether slight, subtle or even potential, it is sufficient to uphold a

prosecution under the Hobbs Act." (internal quotations omitted)). Finally, "[i]n order to establish a Hobbs Act conspiracy," as the defendant is charged in this case, "the government does not have to prove any overt act." United States v. Clemente, 22 F.3d 477, 480 (2d Cir. 1994).

Viewing the record as a whole, the evidence at trial was sufficient for a jury to find Chen guilty of both the extortion conspiracy and attempted extortion. Specifically, the evidence was sufficient for the jury to find that Chen conspired with Jiang and Dong to attack Huang and to threaten his family in an attempt to drive Huang out of business and obtain his bus route business.

First, the testimony of Dong, a participant of the conspiracy, established that in May and June of 2010, Chen entered into an agreement with Jiang and Dong to start a bus business, the Lan Qi Bus Company, driving restaurant workers between Brooklyn or Chinatown and Poughkeepsie. This is the same route driven by Shun An Travel Company, the bus service owned by Huang, as was established by witness testimony and documentary evidence. The testimony of various witnesses, along with a video recording, established that Jiang had driven this same route in early 2010, and that although he attempted to intimidate and threaten Huang, Fung, the driver for Shun An Travel Company, and Wang, a Shun An Travel Company customer,

Jiang was unable to compete with Huang and stopped driving in April or May of 2010.

Second, the testimony of Dong established that Jiang, Chen and Dong agreed to beat up the competitor in order to force him out of business. If they were successful, the Lan Qi Bus Company would take over the Brooklyn to Chinatown to Poughkeepsie bus route, and Jiang, Chen and Dong would divide the profits. Dong explained how Chen and his co-conspirators carefully planned the attack on Huang, finding out when and where Huang parked his vehicle at night, and agreeing to hit Huang in the legs in order to prevent him from driving. Further, Dong testified about how, after several unsuccessful attempts, Chen and Dong carried out the attack on June 21, 2010, bringing along two other attackers to help beat up Huang. The series of events, as explained in great detail by Dong, were corroborated by the testimony offered by Huang and Guan, the 911 caller, and by the phone records. Huang further testified that he was able to see the face of one of his attackers, and identified Chen as that person. In addition, the phone records, combined with the transcript of the MDC call and the testimony of Wan Zhu, Dong and Huang, established that Chen made a call to Huang on July 19, 2010, threatening to kill his family if Huang did not stop running his business. Witness testimony and hospital records documented the injuries suffered by Huang as a

result of the attack, and Huang testified to the fear he felt as a result of the numerous threats and attacks.

Third, the evidence at trial, presented through a stipulation, established that the attempted extortion, if successful, would have had an effect on interstate commerce. Shun An Travel Company, the competing bus business that Chen and his co-conspirators attempted drive out of business, transported restaurant workers from Brooklyn and Chinatown to Poughkeepsie, and those Chinese restaurants served food obtained from out-of-state sources.

Considering all of this evidence in the light most favorable to the government, this evidence is sufficient to support Chen's convictions for extortion conspiracy and attempted extortion. Specifically, the evidence is sufficient to establish that Chen conspired and attempted to obtain property from Huang, i.e. the business of the Shun An Travel Company, by coercing Huang out of business through the wrongful use of threats, violence, and fear, and that his actions, if successful, would have had an effect on interstate commerce. Therefore, Chen's motion for a judgment of acquittal Counts One and Two is denied. See Jackson, 335 F.3d at 180 (finding that a jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt") (internal quotation omitted).

## CONCLUSION

As set forth above, the Chen's motion for judgment of acquittal pursuant to Rule 29 is denied. The sentencing of the defendant will proceed as scheduled on July 25, 2011.

**SO ORDERED.**

Dated:     July 11, 2011
           Brooklyn, New York

_____/s/_____
**KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York